# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SCHOLASTIC CORP.,         :
         :
         Plaintiff,         :     NO. 3:04CV1752 (MRK)
         :
v.         :
         :
NAJAH KASSEM &         :
CASPER & DE TOLEDO LLC,         :
         :
         Defendants.         :

## MEMORANDUM OF DECISION

In the 1930s most lawyers undoubtedly cheered when the drafters of the *Federal Rules of Civil Procedure* jettisoned the distinction between law and equity by fusing the two systems and seemingly ending the days of the divided bench. As was true with Mark Twain, however, rumors of the demise of the law/equity distinction appear to have been greatly exaggerated. For beginning in 1993 in *Mertens v. Hewitt Associates*, 508 U.S. 248 (1993), and continuing in 2002 in *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002), the Supreme Court breathed new life into the law/equity distinction. The Supreme Court did so in the context of the Employee Retirement and Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, holding in *Mertens* that § 502(a)(3) of ERISA authorizes only civil actions seeking remedies "that were *typically* available in equity," *Mertens*, 508 U.S. at 256 (emphasis in original), and holding in *Great-West* that not all relief characterized as "restitution" was typically available in equity or is (therefore) authorized by ERISA. *Great-West*, 534 U.S. at 213. As the Second Circuit recently noted, *Great-West* "reconfigured the

legal landscape of restitution." *Pereira v. Farace*, 413 F.3d 330, 340 (2d Cir. 2005).[1]

Though often criticized, the Supreme Court's decision in *Mertens* and reaffirmation in *Great-West* that Congress intended in ERISA to thrust the courts back into the business of making law/equity distinctions is the governing law. Yet, despite Justice Scalia's cheery assurance that the dissenters in *Great-West* "greatly exaggerate[d] ... the difficulty of th[e] task" of determining the types of remedies typically available in equity, *Great-West*, 534 U.S. at 217, the Supreme Court's decision has created real challenges for those of us who have little training, let alone experience, in the subtleties of ancient writs. So challenging has it been that no less than six circuits have provided markedly different answers to the identical question posed by this case. *See generally Mid Atl. Med. Servs., LLC v. Sereboff*, 407 F.3d 212 (4th Cir. 2005); *Admin. Comm. of Wal-Mart Assocs. Health & Welfare Plan v. Willard*, 393 F.3d 1119 (10th Cir. 2004); *Qualchoice, Inc. v. Rowland*, 367 F.3d 638 (6th Cir. 2004); *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer et al.,* 354 F.3d 348 (5th Cir. 2003); *Admin. Comm. of Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Varco*, 338 F.3d 680 (7th Cir. 2003); *Westaff (USA) Inc. v. Arce*, 298 F.3d 1164 (9th Cir. 2002). To date, at least, the Supreme Court has declined to grant a writ of *certiorari* despite the clear circuit conflict.

The question presented by this case is as follows: Does an ERISA plan seek relief typically available in equity when it sues to recover by constructive trust or equitable lien funds for medical

---

[1] The Court notes that *Pereira* concerned the other area of law where the law/equity distinction retains its relevance – the right to trial by jury. *See Pereira*, 413 F.3d at 337 (commenting that "despite the near universal merger of law and equity effectuated by Federal Rule of Civil Procedure 2, trial by jury remains today 'the sword in the bed that prevents the complete union of law and equity' ") (quoting *Fredal v. Forster*, 9 Mich. App. 215, 228, 156 N.W.2d 606, 612 (1967)).

expenses disbursed to a plan participant, injured in an accident, who has received a settlement from a third party tortfeasor, part of which has been placed in a trust held by the plan participant's counsel pending resolution of the Plan's claim to those funds?  If so, the Court can proceed to determine the rights of the respective claimants to the fund.  If not, the Court must dismiss this action.  The truth is, the answer is not entirely clear.  Moreover, and in any event, the ultimate answer to this question must await definitive word from the Second Circuit or the Supreme Court.  Doing the best it can to divine the true nature of the remedy Plaintiff seeks and the meaning of *Mertens* and *Great West*, the Court concludes (though not without doubt) that Plaintiff seeks a remedy typically available in equity, and thus one that is available under ERISA.  Accordingly, the Court DENIES Defendants' Motion to Dismiss [doc. #13].

## I.

As a preliminary matter, the Court notes that courts apparently differ on whether motions to dismiss under the circumstances presented by this case are properly characterized as motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the *Federal Rules of Civil Procedure* or motions to dismiss for failure to state a claim under Rule 12(b)(6).  *Compare Qualchoice*, 367 F.3d at 642 (analyzing similar circumstances as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction), *Bombardier*, 354 F.3d at 352 (same), *and Varco*, 338 F.3d at 686 (same), *with Sereboff*, 407 F.3d at 217 & n.5 (analyzing similar circumstances as a Rule 12(b)(6) motion to dismiss for failure to state a claim), *and Westaff*, 298 F.3d at 1167 (same). Happily, the Court concludes that it need not decide that issue in this case.  For  Defendants have brought their motion to dismiss under *both* Rule 12(b)(1) *and* Rule 12(b)(6), *see* Defs.' Mot. to Dismiss [doc. #13] at 1.  Furthermore, "the standards for dismissal under 12(b)(6) and 12(b)(1) are

substantively identical." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003); *but see Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (noting that the party invoking the jurisdiction of the court has the burden of proof in a 12(b)(1) motion, in contrast to a 12(b)(6) motion, in which the defendant has the burden of proof).

On a motion to dismiss under either Rule 12(b)(1) or Rule 12(b)(6) of the *Federal Rules of Civil Procedure*, the Court "must accept as true all material factual allegations in the complaint," *J.S. ex rel. N.S. v. Attica Central Schools*, 386 F.3d 107, 110 (2d Cir. 2004), although it should not "draw inferences from the complaint favorable to plaintiffs." *Id.* (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)). "A complaint should not be dismissed . . . 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Todd v. Exxon Corp.*, 275 F.3d 191, 197-98 (2d Cir. 2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  Thus, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996).

On a motion to dismiss under Rule 12(b), "[a] complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations and quotations omitted). Both Scholastic's self-funded employee welfare benefit plan (the "Plan") and a ruling of the Connecticut Superior Court in the related tort action between Defendant Najah Kassem and a third party tortfeasor, *Kassem v. Vanzanten*, No. CV010343818S, 2004 WL 1888850 (Conn. Super. Jul. 22, 2004), were attached as exhibits to Scholastic's Complaint, and are integral to the claims asserted therein. *See* Compl.[doc. #1] Ex. B,

4

C. Therefore, the Court concludes that it may take notice of the Plan and the ruling of the Connecticut Superior Court without transforming Defendants' motion to dismiss under Rule 12(b) into a motion for summary judgment under Rule 56. *See id.* at 153-54.

## II.

The following facts from Scholastic's Complaint are accepted as true for purposes of the pending motion to dismiss. Scholastic maintains a self-funded employee welfare benefit plan for its employees, which is governed by ERISA. *See* Compl. [doc. #1] at ¶ 2; *see also id.* at Ex. B (excerpt of the summary of the Plan). Ms. Kassem was an employee participant in the Plan, and on October 14, 2000, Ms. Kassem was injured in a motor vehicle accident. *See* Compl.[doc. #1] at ¶¶ 4, 8. Scholastic extended benefits to Ms. Kassem under the Plan in the amount of $28,514.77 to cover her medical expenses from the accident. *Id.* at ¶ 9. The Plan contains the following subrogation provision that is at the center of this lawsuit:

> **Subrogation**. In the event a Covered Person suffers an injury or Sickness as a result of an allegedly negligent or wrongful act or omission of a third party, the Plan has the right to pursue subrogation against any person or insurer. The Plan will be subrogated and succeed to the Covered Person's right of recovery against any person or insurer. The Plan may use this right to the extent of the benefits under this Plan. The Covered Person agrees to help the Plan use this right when requested.

*Id.* at Ex. B (excerpt of Plan summary).

Ms. Kassem later filed a lawsuit in Connecticut Superior Court against the third party allegedly responsible for the motor vehicle accident, a suit that she ultimately settled for $75,000. *See* Compl. [doc. #1] at ¶ 11. In an order regarding the funds that are the focus of this action, the Connecticut Superior Court directed a portion of the funds commensurate with Scholastic's claim to be held in a client trust account under the supervision of Defendant Casper & de Tolledo, LLC,

Ms. Kassem's attorneys.  *See id.* at ¶¶ 3, 12.  The Connecticut Superior Court specifically stated it

> intends that the funds which might be payable to [Scholastic] be held in a proper
> account in order that all involved persons and entities, [Ms. Kassem], defendant,
> [Casper & de Tolledo] and defendant carrier, be protected.  *This is to say,
> disbursement to [Ms. Kassem] must be limited so as to preserve a residue sufficient
> to fully meet any obligation emanating from resolution of the ERISA dispute.*

*Kassem*, 2004 WL 1888850, at *1 (emphasis added).  This action followed.

### III.

### A.

Section 502(a)(3) of ERISA authorizes a civil action "by a participant, beneficiary, or

fiduciary (A) to enjoin any act or practice which violates . . . the terms of the plan, or (B) to obtain

other *appropriate equitable relief* (i) to redress such violations or (ii) to enforce any provisions of

. . . the terms of the plan."  29 U.S.C. § 1132(a)(3) (emphasis added).  The meaning of "appropriate

equitable relief" – three key words in the 110,000-words that comprise the ERISA statute – was

explored in detail by Justice Antonin Scalia in his decision for the majority in *Mertens v. Hewitt

Associates*, 508 U.S. 248 (1993).

*Mertens* was a case in which a group of plan participants sued an ERISA plan's actuary (a

non-fiduciary) for damages resulting from a mistake by the plan's actuary that eventually caused the

plan's assets to become insufficient to satisfy the plan's benefit obligations.  *Mertens*, 508 U.S. at

250.  Writing for the Supreme Court, Justice Scalia framed the question in *Mertens* as follows:

"[W]hether ERISA authorizes suits for money damages against nonfiduciaries who knowingly

participate in a fiduciary's breach of fiduciary duty."  *Id.* at 251.  In interpreting the statutory phrase

"appropriate equitable relief" in § 502(a)(3) of ERISA, the Supreme Court looked to a well-known

treatise on equity and stated as follows:

At common law . . . there were many situations . . . in which an equity court could "establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority."  The term "equitable relief" can assuredly mean, as petitioners and the Solicitor General would have it, whatever relief a court of equity is empowered to provide in the particular case at issue. But as indicated by the foregoing quotation – which speaks of "legal remedies" granted by an equity court – "equitable relief" can also refer to those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages).

*Mertens*, 508 U.S. at 256 (emphasis in original) (quoting 1 J. Pomeroy, *Equity Jurisprudence* § 181, at 257 (5th ed. 1941)). *Mertens* held that in enacting § 502(a)(3), Congress had intended to authorize only the category of relief that was "typically" available in equity – "such as injunction, mandamus, and restitution" – and not all remedies that conceivably might have been granted by an equity court. *Id.*

The Supreme Court's holding in *Mertens* was later clarified, again by Justice Scalia writing for the majority, in *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002). *Great-West* presented facts broadly similar to those of the present case:  An ERISA plan participant was injured in a car accident; her plan covered her medical expenses (totaling over $400,000); she then filed a tort action in state court; and she ultimately settled with the third party tortfeasor (for $650,000).  *See Great-West*, 534 U.S. at 207.  Unlike the present case, a large portion of Ms. Knudson's settlement was placed in a Special Needs Trust for the benefit of Ms. Knudson, to cover her future medical expenses.  *See id.* at 207-08.  The insurance company that had paid Ms. Knudson's medical expenses through an ERISA plan sued her under ERISA § 502(a)(3) to enforce the reimbursement provision of the plan, and recover from the Special Needs Trust some or all of the $400,000 it had paid out to her. *See id.* at 208-09. Seeking to fit within *Mertens*' interpretation of "appropriate equitable relief," the insurer characterized its action as one for "restitution." *See id.*

7

at 212.

*Great-West* reaffirmed the holding in *Mertens* that "the term 'equitable relief' in § 502(a)(3) must refer to 'those categories of relief that were *typically* available in equity.' "  *Great-West*, 534 U.S. at 210 (quoting *Mertens*, 508 U.S. at 256).  Notwithstanding the insurer's labeling of its relief as "restitution," the Supreme Court characterized the insurance company's action as seeking "in essence, to impose personal liability on respondents for a contractual obligation to pay money – relief that was not typically available in equity." *Great-West*, 534 U.S. at 210.  *See also Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Wells*, 213 F.3d 398, 401 (7th Cir. 2000) (Posner, J.) ("A claim for money due and owing under a contract is 'quintessentially an action at law.' ") (quoted in *Great-West*, 534 U.S. at 210).  Therefore, the Supreme Court held that the relief sought by the insurance company was not authorized by ERISA.

In the course of his opinion for the Supreme Court in *Great-West* – and of particular relevance to this case – Justice Scalia clarified his prior statements in *Mertens* regarding restitution. According to Justice Scalia,  "not all relief falling under the rubric of restitution is available in equity," and therefore, only claims seeking *equitable* restitution are permitted under § 502(a)(3) of ERISA. *Great-West*, 534 U.S. at 213.  As explained by Professor John H. Langbein of the Yale Law School (described by the Second Circuit as  "the country's leading ERISA scholar," *Cicio v. Does*, 321 F.3d 83, 106 (2d Cir. 2003), *vacated on other grounds by Vytra Healthcare v. Cicio*, 124 S. Ct. 2902 (2004)), "not all of the modern law of restitution derives from equity." John H. Langbein, *What ERISA Means by "Equitable": The Supreme Court's Trail of Error in Russell, Mertens, and Great-West*, 103 Colum. L. Rev. 1317, 1357 (Oct. 2003). Rather,

[t]he American Law Institute effectively created the law of restitution in the

8

Restatement of Restitution (1937), which integrated functionally overlapping rules that had developed as constructive trust in equity and as quasi-contract at common law. The fusion of law and equity made the law of restitution possible. The driving insight was that both quasi-contract and constructive trust rested on a common principle: remedying unjust enrichment. Procedural unification (fusion) animated doctrinal consolidation (restitution).

*Id.*

According to *Great-West*, a restitution claim was considered *legal* when a plaintiff " 'could *not* assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him.' " *Great-West*, 534 U.S. at 213 (emphasis in original) (quoting 1 Dan B. Dobbs, *Law of Remedies* § 4.2(1), at 571 (2d ed. 1993)). In such a case, the plaintiff in reality seeks "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money," which is "essentially [an] action[] at law for breach of contract (whether the contract was actual or implied)." *Id.* (internal quotations omitted).

By contrast, "a plaintiff could seek restitution *in equity* . . . where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* (emphasis in original) (citing 1 Dobbs § 4.3(1), at 587-588; Restatement (First) of Restitution, § 160, cmt. a, at 641-642 (1937); 1 George E. Palmer, *Law of Restitution* §§ 1.4, 3.7, at 17, 262 (1978)). Such restitution would be accomplished by means of a constructive trust or equitable lien – substantially similar remedial mechanisms traditionally available in equity. *See Great-West,* 534 U.S. at 212-13 (observing that "[i]n the days of the divided bench," "a plaintiff could seek restitution *in equity* ordinarily in the form of a constructive trust or an equitable lien"). "The constructive trust is only used when the defendant has a legally recognized

9

right in a particular asset.  The asset may be . . . a fund of money like a bank account. . . . [I]t must be an asset that can be identified as belonging in good conscience to the plaintiff in spite of the defendant's legal right to it." 1 Dobbs § 4.3(2), at 591 (footnotes omitted).  "The equitable lien when imposed . . . to prevent unjust enrichment, is essentially a special, and limited, form of the constructive trust.  The lien is imposed for reasons that, in principle, are the same as those that warrant the constructive trust, and it works in substantially the same way.  Where the constructive trust gives a complete title to the plaintiff, the equitable lien only gives him a security interest in the property, which he can then use to satisfy a money claim." 1 Dobbs § 4.3(3), at 601 (footnote omitted).  However, if "the property sought to be recovered or its proceeds have been dissipated so that no product remains, the plaintiff's claim is only that of a general creditor, and the plaintiff cannot enforce a constructive trust of or an equitable lien upon other property of the defendant." *Great-West*, 534 U.S. at 213-14 (internal quotations and alterations omitted).

Therefore, under *Mertens* and *Great West*, the narrow issue before this Court is whether the "restitution" sought by Scholastic – that is, the constructive trust and equitable lien it seeks – is truly relief typically available in equity.  Of course, as the insurer in *Great West* learned to its chagrin, mere labels do not govern the Court's analysis.  Instead, "[i]n determining the propriety of a remedy, [a court] must look to the real nature of the relief sought, not its label." *Gerosa v. Savasta & Co. Inc.*, 329 F.3d 317, 321 (2d Cir. 2003) (citing *Great-West*, 534 U.S. at 210); *see Mertens*, 508 U.S. at 255; *see also Coan v. Kaufman*, 333 F. Supp. 2d 14, 25 (D. Conn. 2004) ("[I]n *Great-West* the Supreme Court made it clear that an individual cannot evade this restriction on damage claims by characterizing one's request for monetary relief as 'restitution.' ") (citation omitted).

**B.**

In the wake of *Great-West*, a clear circuit split has developed between the Fourth, Fifth, Seventh, and Tenth Circuits (on the one hand) and the Sixth and Ninth Circuits (on the other hand) on how best to apply *Great-West* in determining the true nature of the relief sought in an ERISA action based on facts substantially similar to those presented in this case. *Compare Sereboff*, 407 F.3d at 218-19, *Willard*, 393 F.3d at 1126, *Bombardier*, 354 F.3d at 355-58, *and Varco*, 338 F.3d at 686-88, *with Qualchoice*, 367 F.3d at 648-50, *and Westaff*, 298 F.3d at 1166-67.[2]

Broadly speaking, one group – the Fourth, Fifth, Seventh, and Tenth Circuits – focuses almost entirely on the nature of the remedy sought by the ERISA plan. These circuits apply a three-part test for determining whether a remedy sought by a plan, and labeled as a constructive trust or equitable lien, is typically equitable. Though first developed by the Seventh Circuit in *Varco*, 338 F.3d at 686-88, the three-part test was succinctly summarized by the Fifth Circuit in *Bombardier* as follows: "Does the Plan seek to recover funds (1) that are specifically identifiable, (2) that belong in good conscience to the Plan, and (3) that are within the possession and control of the defendant beneficiary?" *Bombardier*, 354 F.3d at 356. The Fourth and Tenth Circuits have employed the same three-prong test. *See, e.g.*, *Sereboff*, 407 F.3d at 218; *Willard*, 393 F.3d at 1122 (citing *Bombardier*, 354 F.3d at 356; *Varco*, 338 F.3d at 687).

In all these cases – *Varco*, *Bombardier*, *Mid Atlantic Medical Services*, and *Willard* – the courts concluded that the constructive trust sought by the plan was equitable. The courts justified this

_____

[2] The Eighth Circuit also recently affirmed a district court's imposition of an equitable constructive trust over overpaid benefits and required the return of the funds and a tracing of any portion of the funds no longer in beneficiaries' possession or control under § 502(a)(3) of ERISA. The facts of that case differed from the case before this Court and need not be directly addressed here. *See N. Am. Coal Corp. v. Roth*, 395 F.3d 916, 917 (8th Cir. 2005).

conclusion by focusing on the relief sought and drawing mechanical distinctions between the relief

sought in those cases and that requested in *Great-West*. Thus, the Fourth Circuit in *Sereboff* stated:

> [T]he disputed funds are within the possession and control of the [the plan beneficiaries]. They received those funds in the California litigation and held them in their investment accounts pending resolution of this proceeding. In [*Great-West*], by contrast, the funds received from the tortfeasor were placed in a Special Needs Trust, outside the possession or control of the beneficiary. Thus, the action pursued by [the plan] . . . is equitable in nature under § 502(a)(3).

407 F.3d at 219. Similarly, the Tenth Circuit in *Willard* concluded:

> The instant case, however, is distinguishable [from *Great-West* and others]. . . . [A]lthough [the plan participant] is not in physical possession of the settlement proceeds, he did exercise control over the funds and can be deemed to be in constructive possession of the funds.
>
> . . . .
>
> . . . [W]e find that the instant case, rather than involving one for monetary damages, involves exactly the type of equitable restitution claim the Court had in mind in *Great-West*.

393 F.3d at 1124-25. In *Bombardier*, the Fifth Circuit stated:

> In [*Great-West*], the funds had been placed in a Special Needs Trust, as mandated by California law, to provide for the beneficiary's medical care, and the trustee was totally independent of the plan beneficiary. . . . Here, in stark contrast, the funds that the Plan is seeking to recover belong to the participant and are simply being held in a bank account in the name of the participant's attorneys, who are indisputably his agent. Unlike the beneficiaries in [*Great-West*] . . . , the Plan's participant, . . . has ultimate control over, and thus constructive possession of, the disputed funds. . . . This crucial distinction is more than sufficient to warrant a finding that the Plan's action is indeed 'equitable' in nature.

354 F.3d at 356. And in *Varco*, the Seventh Circuit explained that "[u]nlike the legal action

addressed in [*Great-West*], the funds at issue here are identifiable, have not been dissipated, and are

still in the control of a Plan participant. . . ." 338 F.3d at 687.

Even though Justice Scalia had relied heavily on treatises on equitable remedies and restitution to illuminate an historical analysis of the law/equity distinction in both *Mertens* and *Great-West* – treatises such as Dobbs' *Law of Remedies*, Palmer's *Law of Restitution*, and Pomeroy's *Equity Jurisprudence* – the Fourth, Fifth, Seventh and Tenth Circuits eschewed references to treatises and other historical sources in support of their conclusions that the relief sought in the cases before those courts was typically equitable.   In reality, the legal analysis in those cases consists almost entirely of identifying distinctions from, or special circumstances that did not exist in, *Great-West*, then inferring from the lack of those circumstances that the relief sought must be typically equitable.

By and large, the second group of circuits – the Sixth and the Ninth – have taken the opposite approach to the first group.   The second group has fixated on the basis of the plan's claim, rather than on the remedy sought and any factual distinctions from *Great West*.   In all these cases – as in Scholastic's – an ERISA plan has brought suit because of a plan participant's alleged breach of the subrogation or reimbursement terms of the plan contract.   For the Sixth and Ninth Circuits, the fact that the plan's claim originates in the plan's contract and seeks monetary damages is entirely determinative of whether the plan is seeking relief that is permissible under ERISA.   Thus, in rejecting the approach of the Fifth and Seventh Circuits, the Sixth Circuit in *Qualchoice* emphasized that

> *the source of the claim* asserted by [the ERISA plan] is a contract to pay money, and . . . the procedural mechanisms of constructive trust and equitable lien are not proper mechanisms for enforcing this right, as such relief would not have traditionally been awarded by a court of equity *in a breach of contract action*.
>
> . . . .

13

> . . . [A] plan fiduciary's action to enforce a plan-reimbursement provision is a legal action, regardless of whether the plan participant or beneficiary recovered from another entity and possesses that recovery in an identifiable fund.

*Qualchoice*, 367 F.3d at 649-50 (emphasis added). Similarly, the Ninth Circuit in *Westaff* observed that the ERISA plan administrator was "seeking to enforce a contractual obligation for the payment of money, a *classic action at law* and not an equitable claim." 298 F.3d at 1166 (emphasis added). *See also BlueCross BlueShield of South Carolina v. Carillo*, 372 F. Supp. 2d 628, 637-38 (N.D. Ga. 2005) (finding the Sixth and Ninth Circuits' reasoning "persuasive" and concluding "that Plaintiff's claim, regardless of whether it is styled as a claim for a constructive trust, for equitable restitution, or for an equitable lien, simply seeks to enforce a provision of a plan document that would require Defendants to pay money.").[3]

The Second Circuit has yet to confront a case with similar facts and therefore has not weighed in directly on this circuit split. The Court notes, however, two recent Second Circuit opinions that are factually very different from the case at bar but in which the Circuit had occasion to discuss the Supreme Court's holding in *Great West*. In *Pereira*, the Second Circuit characterized *Great-West*'s explanation of the distinction between legal and equitable restitution as establishing a "rule that a defendant must possess the funds at issue for the remedy of equitable restitution to lie against him." *Pereira*, 413 F.3d at 340. *See also Gerosa*, 329 F.3d at 321 ("Plaintiffs have not

---

[3] The Sixth Circuit does provide some treatise support for its conclusion, though it is mixed. For example, to support its assertion that a constructive trust remedy "would not have traditionally been awarded by a court of equity in a breach of contract action," *Qualchoice*, 367 F.3d at 649, the Sixth Circuit emphasized that "[a]ccording to Professor Dobbs, 'Restitution claims for *money* are usually claims at law.' " *Id.* at 648 (quoting 1 Dobbs §4.1(1), at 556) (emphasis added in *Qualchoice*). However, the Sixth Circuit also acknowledged that "[i]t is true that an equitable lien or a constructive trust may be imposed on a particular bank account." *Id.* at 649 (citing 1 Dobbs § 4.3(2), at 591).

alleged sufficient facts to make out a claim for restitution. The moneys sought by the Plaintiffs were never in [the defendant]'s possession"); *Neidich v. Estate of Neidich*, 222 F. Supp. 2d 357, 375 (S.D.N.Y. 2002) (dismissing plan administrator's claim against participant for restitution where funds had been dispersed and could no longer be traced to a particular fund in defendant's possession).

In *Nechis v. Oxford Health Plans, Inc.*, the Second Circuit indicated that it may take a more rounded approach than either side in the current circuit split, giving weight to both the basis of the claim and the nature of the relief requested. *Nechis*, 2005 WL 2018630 (2d Cir. Aug 24, 2005). In declining the "invitation to perceive equitable clothing where the requested relief is nakedly contractual," *id.* at *6, the *Nechis* court first emphasized the tracing prerequisite for the equitable remedies of constructive trust or equitable lien, that is, the requirement that the funds claimed by the plaintiff can "clearly be traced back to particular funds in the defendant's possession." *Id.* (quoting *Great-West*, 534 U.S. at 213). However, the Second Circuit did not stop at the plaintiff's tracing problem, but also placed weight on the fact that "the language of Nechis' request involves words of contract rather than those of equity." *Id.*

## IV.

In the end, it appears that neither side of the current circuit split is entirely consistent with the framework developed by Justice Scalia in *Great-West*. *Great-West* offered the following specific guidance for courts to follow in assessing the true nature of a claim for restitution: "whether [restitution] is legal or equitable depends on 'the basis for the plaintiff's claim' *and* the nature of the underlying remedies sought." *Great-West*, 534 U.S. at 213 (emphasis added) (internal alterations omitted) (quoting *Reich v. Continental Casualty Co.*, 33 F.3d 754, 756 (7th Cir. 1994) (Posner, J.)).

Thus, a court should look at *both* the underlying basis for the plaintiff's claim *and* the nature of the remedy sought.  It is worth noting that in this sense, *Great-West*'s two-pronged analysis of restitution is similar to the two-pronged test that the Supreme Court has used to determine the right to a jury trial.  As outlined by the Supreme Court in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989): "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature."  *Id.* at 42 (internal quotation marks omitted); *see also* 1 Dobbs § 2.6(3), at 155 ("The Supreme Court . . . in decisions governing federal trials, has said it would consider *both* historic analogies *and* remedies to determine the equitable or legal status of a claim.") (emphasis in original).

Neither side of the current circuit split has, as this Court sees it, adequately applied this two-pronged approach to the question whether under circumstances similar to this case, a plan is seeking equitable or legal relief.  The approach of the Fourth, Fifth, Seventh, and Tenth Circuits focuses chiefly on the relief sought, highlighting factual differences from *Great-West* in the  mechanics of the remedy sought.  This approach largely omits consideration of whether the basis for the plan fiduciary's claim traditionally would have been entertained by courts in equity.  By contrast, the approach of the Sixth and Ninth Circuits simply proclaims that because the plan fiduciary's rights ultimately derive from a contract and the plan seeks money, the plan must be seeking legal relief, a conclusion that is neither necessarily consistent with historical practice nor sufficiently nuanced under the *Great-West* formulation.

As a consequence, the Court chooses not to pick a side in the current circuit split.  Instead, the Court will attempt to apply both prongs of the two-pronged test specified in *Great-West*. The

Court believes that this approach is the most consistent with those indications of the Second Circuit's understanding of *Great-West* that can be gleaned from *Nechis*. The Court hastens to acknowledge, however, that inquiries into the nature of a party's claim and the relief a party seeks often overlap, and that attempting to discuss them separately may at times seem artificial.

### A.

The Court first turns to the question of the basis of Scholastic's claim. In a trivial sense, the basis of Scholastic's claim is contractual. Scholastic's route into federal court, after all, is to sue under ERISA for enforcement of, or redress for, violations of the terms of its employee benefit plan, which is a contract between Scholastic and Ms. Kassem. *See, e.g.*, *Wells*, 213 F.3d at 402 ("for most purposes ERISA plans are" contracts). That Scholastic's claim is contractual in this sense does not end the inquiry, however, since § 502(a)(3) clearly contemplates the provision of "equitable relief" to "redress such violations or . . . to enforce any provisions of . . . the terms of" such employee benefit contracts. 29 U.S.C. § 1132(a)(3). In investigating the basis of the claim, the relevant inquiry under *Great West* is whether Scholastic is seeking "to impose personal liability . . . for a contractual obligation." *Great-West* 534 U.S. at 210. The Court concludes that Scholastic is not.

Rather than seeking recovery from Ms. Kassem's pocket – that is, personal financial liability for her contractual obligation – Scholastic asserts a subrogation right to a limited portion of settlement money owed to Ms. Kassem by a third-party tortfeasor, money which has never entered Ms. Kassem's pocket but has been held in a trust account pending resolution of this lawsuit. Scholastic has named as defendants in this suit the attorneys who by order of the Connecticut Superior Court hold a fund that was created when the tortfeasor placed in the fund a portion of the money it owed from its state-court settlement. Scholastic asserts an equitable subrogation right to

17

the money paid into the fund by the tortfeasor.  For her part, Ms. Kassem contests Scholastic's right to any of the money held in the fund and asserts that the fund belongs instead to her.

Scholastic's claim against the fund held by the attorneys has an obvious historical analog in equity: a subcontractor's subrogation claim against a landowner.  Provided that the landowner has set aside a designated fund for payment of a general contractor as work proceeds,[4] a subcontractor who has performed services on the land but has not been paid for them by the contractor may assert a right of subrogation and seek an equitable lien on the designated fund in order to prevent the contractor from recovering twice – once in the form of the subcontractor's unpaid services, and a second time in the form of money from the landowner paid into the designated fund.[5]  *See* 3 Dobbs § 12.20(3), at 470.

In this case, the tortfeasor stands in place of the landowner, having (upon order by the Connecticut Superior Court) designated a fund to cover a part of its obligations to Ms. Kassem commensurate with Scholastic's payment of Ms. Kassem's medical expenses. Ms. Kassem, in turn, stands in place of the general contractor: If she recovers from the designated fund without having spent her own money on medical costs, she may be unjustly enriched at the expense of the insurer, Scholastic.

---

[4] The existence of a designated fund is a critical prerequisite for assertion of the subcontractor's equitable subrogation right: The subcontractor may not hold the owner generally liable *in equity* for the general contractor's failure to pay the subcontractor for services rendered. *See* 3 Dobbs § 12.20(3), at 471-72 ("An owner is not . . . liable to a subcontractor for making improvements for which the owner contracted only to pay the general contractor.") (footnotes omitted).

[5] In view of the potential risks faced by subcontractors, most states have made the policy choice to provide a similar statutory right – a statutory Mechanic's lien – whereby subcontractors, workers, and suppliers may impose liens against the landowner to secure their rights of payment. *See* 3 Dobbs § 12.20(3), at 474.

The mere fact that the subcontractor may also have a right to recover from the general contractor – or, here, Scholastic from Ms. Kassem – for breach of contract does not alter the equitable nature of the suit to enforce an equitable lien to recover from a designated fund money rightfully owed to the subcontractor – or, here, Scholastic.   As the Supreme Court has stated repeatedly over more than a century: " 'The right of subrogation is not founded on contract. *It is a creature of equity*; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties.' " *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 137 n.12 (1962) (emphasis added) (quoting *Memphis & L.R.R. Co. v. Dow*, 120 U.S. 287, 301-02 (1887)), *cited in Aetna Cas. & Sur. Co. v. United States*, 71 F.3d 475, 478 (2d Cir. 1995).   Moreover, as Professor Langbein explains, "[t]he leading English treatise on restitution . . . observ[es] that 'subrogation was known to the Chancellor in the seventeenth century' before the development of the law of quasi-contract at common law; . . . [it] 'arises independently of, and "not by force of," contract and will be granted if it is just and equitable to do so.' "  Langbein, *supra*, at 1357-58 (quoting Robert Goff & Gareth Jones, *The Law of Restitution* § 3-004, at 123 (Gareth Jones ed., 6th ed. 2002)).   The clear lesson of these sources – that the equitable right of subrogation is independent of any contractual relation between the parties – and the plain language of ERISA clearly contemplating equitable relief for some claims arising from violations of the terms of employee-benefit contracts, leads this Court respectfully to disagree with the Sixth and Ninth Circuits' practice of rejecting claims like Scholastic's on the ground that they seek to enforce subrogation provisions found in the plan contract.[6]

_____

[6] The Court notes that an amicus brief in *Great-West* (submitted by invitation of the Supreme Court) made the identical argument advanced by the Sixth and Ninth Circuits – namely, that because an ERISA plan is a contract, the suit brought by the plan was simply enforcing its

The subrogation right is a creature of equity, independent of contractual obligations, because it is driven by the fundamentally equitable desire to prevent unjust enrichment, rather than to make a plaintiff whole for the damage caused by a breach of contract. In his treatise, Palmer describes the right of subrogation in the insurance context in the following manner:

> When the insurer's case is based upon the subrogation right . . . several cases have taken the position that the insurer has a lien on the proceeds of the insured's recovery. . . . This is not an express lien based on agreement, but instead is an equitable lien impressed on moneys on the ground that they ought to go to the insurer. They ought to go to the insurer only because of its subrogation right, and that right is to recover medical expense from the tortfeasor to the extent that the insurer has paid such expense. . . . In short, *principles of unjust enrichment are controlling, because in this context equitable lien is merely a remedy for preventing unjust enrichment of the insured.*

4 Palmer § 23.18(d), at 470 (footnote omitted) (emphasis added) (citing *Bernardini v. Home & Automobile Ins. Co.*, 212 N.E.2d 499 (1965); *Davenport v. State Farm Mut. Automobile Ins. Co.*, 81 Nev. 361 (1965); and *Collins v. Blue Cross of Virginia*, 213 Va. 540 (1973)); *see also Miller v. Liberty Mut. Fire Ins. Co.*,  264 N.Y.S.2d 319, 323 (Sup. 1965) ("[Insurer] does not claim an *assignment* but an 'equitable lien by subrogation on any *recovery*.' The language of the policy is broad but, construed as a whole, constitutes such subrogation and permits the exaction of the trust receipts. These, rightly construed, are . . . agreements by the insured to hold as trustee for the benefit of his insurer any recovery by him from third parties for the medical expenses for which he has been reimbursed by his insurer to the extent of such payment.") (emphasis in original), *cited in* 4 Palmer

---

contractual rights and therefore must be legal and not equitable.  Brief of Amicus Curiae in Support of the Judgment Below by Invitation of the Court at 22-32, *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002) (No. 99-1786), *available at* 2001 WL 740878. However, Justice Scalia chose a more complex analysis than that urged by the amicus, suggesting to this Court that the approach advanced by the amicus brief, and embraced by the Sixth and Ninth Circuits, cannot be correct under *Great-West*.

§ 23.18(d), at 471 n.54.

In order to give meaning to ERISA's contemplation of equitable relief for at least some claims arising out of breach of the provisions of employee-benefit contracts, and by analogy with the equitable lien enforced in order to prevent unjust enrichment against a fund designated by a third-party, the Court concludes that the basis of Scholastic's claim properly can and should be considered "typically equitable," within the meaning of *Mertens* and *Great-West*.

## B.

Having found a plausible historical analog in equity for Scholastic's claim in this case, the Court next turns to the nature of the relief sought by Scholastic. The form of relief requested by Scholastic is a constructive trust. Compl. [doc. #1] at ¶¶ 15, 16b.  As Justice Scalia has noted,  a constructive trust is a traditionally equitable remedy that may lie when "money or property": 1. "[is] identified as belonging in good conscience to the plaintiff"; 2. "[can] clearly be traced to particular funds or property"; and 3. "[is] in the defendant[s'] possession." *Great-West*, 534 U.S. at 213, *quoted in Nechis*, 2005 WL 2018630, at *6.  Crediting Scholastic's version of the facts and the nature of the Plan as true at this preliminary stage – as the Court must on a motion to dismiss – the Court concludes that each of these requirements for a constructive trust is met.

First, on Scholastic's account,  there is a specifically identifiable *res* – namely, the portion of the tortfeasor's settlement payment that the Connecticut Superior Court designated as corresponding to the ERISA dispute and ordered the tortfeasor to pay into Defendant Casper & de Tolledo's client trust account pending this Court's determination of the proper beneficiary.  *See* Compl. [doc. #1] at ¶ 12. These identifiable funds can be traced directly to Ms. Kassem's settlement

of her state-court tort action, and, to date, the funds have not been dispersed to her or otherwise dissipated.  Broadly construed, Scholastic's Complaint alleges that these specifically identifiable funds belong in good conscience to the Plan because some part of the settlement from the tortfeasor was recovered in compensation for Ms. Kassem's medical expenses.  *See* Compl. [doc. #1] at ¶ 10; *see also id.* at Ex. B.

Defendants counter that the funds in question are not strictly "identifiable" because the settlement with the third party tortfeasor did not designate which portion of the settlement was attributable to Ms. Kassem's medical expenses, and because the decision of the Connecticut Superior Court did not fix the value of Scholastic's claim.  *See* Defs.' Reply [doc. #18] at 1-3; Defs.' Mem. in Supp. of Mot. to Dismiss [doc. #14] at 3, 11 n.6.  This may eventually be a formidable issue for Scholastic to overcome, and the Court does not intend to indicate any view at this stage on how it will ultimately resolve the question.  However, such a fact-dependent argument is not a proper basis for dismissing Scholastic's complaint before the facts are developed.

Second, even though the funds held by Defendant Casper & de Tolledo are not the same funds that Scholastic paid to Ms. Kassem's health-care providers under the Plan, the tracing requirement for a constructive trust is surely met in this case under the Supreme Court's analysis in *Pearlman*. In that case, a general contractor defaulted on its obligation to pay its subcontractors, and the general contractor's surety paid the bills in its place. The surety then asserted "superior right and title [over the trustee in bankruptcy] to a fund withheld by the [landowner] out of earnings due the contractor." *Pearlman*, 371 U.S. at 133. The district court directed the trustee to pay over the fund and the Second Circuit affirmed. Finally, the Supreme Court held that the surety had an equitable interest in the funds retained by the landowner to pay the contractor, and traced the surety's right to

the fund as follows: "The [landowner] had a right to use the retained fund to pay laborers . . . [who] had a right to be paid out of the fund . . . the contractor . . . would have become entitled to the fund and . . . the surety, having paid the laborers . . . is entitled to the benefit of all these rights to the extent necessary to reimburse it." *Id.* at 141 (quoted in 3 Dobbs § 12.20(3), at 470 n2).

Third, as pleaded in Scholastic's Complaint, the funds in question are in the constructive, if not actual, possession and control of Defendants. *See* Compl.[doc. #1] at ¶¶ 3-4.  Defendants disagree, arguing that the funds were placed in the Defendants' trust account by order of the Connecticut Superior Court and cannot be disbursed until resolution of Scholastic's claim in this lawsuit. *See* Defs.' Mem. in Supp. of Mot. to Dismiss [doc. #14] at 13. The Court is unpersuaded. The disputed funds were placed in Defendant Casper & de Tolledo's trust account. Defendant Casper & de Tolledo exercises custody and control over those funds precisely so that this Court may decide who has the greater right to the money and order Casper & de Tolledo to disburse it accordingly. The funds at issue here are held separately from the rest of Ms. Kassem's settlement subject to an eventual order that they be paid to Scholastic, and are therefore quite different from the funds held in a Special Needs Trust created expressly for the benefit of the defendant plan participant in *Great-West*. *See Great-West* 534 U.S. at 214.[7]

---

[7]  If these funds had not been specifically segregated and kept in a trust account in possession and control of Defendants, Scholastic would have a much more difficult time arguing that it was seeking truly equitable relief. *Cf. Varco*, 338 F.3d at 687-88 ("[Defendant] would have a valid argument under traditional principles of equity if an identifiable *res* did not exist to which the [plaintiff] could claim a legally recognized right . . . [or] if the [plaintiff] could not trace its property to a specific fund of money.") (internal citations omitted).

  At oral argument Scholastic made two suggestions that the Court sees no need to embrace. The Court need not go so far as to hold that even if the funds were not in a specifically segregated fund but were nonetheless traceable to the underlying tort settlement, Scholastic would still be seeking equitable restitution. *Cf. Mid Atl. Med. Servs.*, 407 F.3d at 218. Nor need the Court go so far as to hold that even if the funds were not in the direct possession and control

Finally, Defendants argue that the equitable relief of a constructive trust requires a demonstration of fraud and that the contours of the constructive trust or equitable lien should be governed by state, not federal, common law. *See* Defs.' Mem. in Supp. of Mot. to Dismiss [doc. #14] at 14-19. Neither argument has merit. It is well established that "courts should determine 'rights and obligations' under ERISA plans by developing a body of federal common law." *Dobson v. Hartford Fin. Servs. Group, Inc.*, 389 F.3d 386, 399 (2d Cir. 2004) (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987); and *Varity Corp.* V. Howe, 516 U.S. 489, 497 (1996)).[8] And "federal common law does not require a plaintiff in a § 502(a)(3) action to show that he was the victim of actual fraud or wrongdoing as a prerequisite to obtaining a constructive trust." *Bombardier*, 354 F.3d at 359-60. In fact, both sides of the circuit split noted above agree on this point. *See Qualchoice*, 367 F.3d at 649 ("[A] plaintiff is not necessarily required to prove wrongdoing by the defendant in order to obtain relief through imposition of a constructive trust or an equitable lien.") (citing 1 Dobbs § 4.3(2), at 597-98). "Neither wrongdoing nor title is an essential element of a restitution claim." 1 Dobbs § 4.1(2), at 559.

In sum, the remedy Scholastic seeks is a court order, by means of a constructive trust or equitable lien, directing Defendants to turn over a specifically identifiable *res* in their possession that

---

of the defendants, Scholastic would still be seeking equitable restitution. *Cf. Willard*, 393 F.3d at 1125.

[8] *See also Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 255 (2d Cir. 2004) ("ERISA preempts any and all State laws insofar as they may . . . relate to any employee benefit plan covered by ERISA. . . . An ERISA-regulated plan is thus to be construed in accordance with federal common law. In developing federal common law in an area, the courts may look to state law; but they may use state common law as the basis of the federal common law only if the state law is consistent with the policies underlying the federal statute in question.") (internal citations and quotations omitted).

Scholastic claims equitably belongs to the Plan and must be disgorged to it in order to prevent the unjust enrichment of Ms. Kassem.  Therefore, the substance of the relief Scholastic seeks is typically equitable.  Because *both* the basis of Scholastic's claim *and* the nature of the underlying relief sound in equity, the Court concludes that Scholastic is seeking "appropriate equitable relief" under § 502(a)(3) of ERISA as that phrase has been interpreted by the Supreme Court.  *See Great-West*, 534 U.S. at 213.

## V.

For the reasons stated above, Defendants' Motion to Dismiss [doc. #13] is DENIED.


IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge


**Dated at New Haven, Connecticut: <u>September 19, 2005</u>.**

25